IN THE UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Marsha Jackson, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 3:20-cv-00967-M |
| Blue Star Recycling, LLC; | * | |
| CCR Equity Holdings One, LLC, | * | |
| Cabe Chadick, and | * | |
| City of Dallas, | * | |
| Defendants. | * | |

## **AMENDED COMPLAINT**

### **Table of Contents**

Introduction   3

Jurisdiction   4

Parties   4

Plaintiff   4

Defendants   5

Facts   5

I.   Defendants Blue Star Recycling LLC, CCR Equity Holdings One LLC, and Cabe Chadick contributed to the handling, storage, and disposal of illegal solid or hazardous waste at Shingle Mountain in violation of RCRA 42 U.S.C. § 6972(a)(1)(B).   5

    A. The asphalt shingle material at Shingle Mountain is solid waste.   10

    B. The Defendants Blue star, CCR, and Mr. Chadick use the site for an illegal solid waste landfill   11

    C. The storage and processing of the shingle materials constitutes a substantial endangerment to health and the environment   14

    D. Plaintiff's Notices of Intent to File RCRA Citizens' Suit

for violations of 42 U.S.C. § 6972(a)(1)(B).    17

II.    The City has contributed to the past and present handling, storage,
treatment, transportation, or disposal of the asphalt shingle solid waste
at Shingle Mountain.    19

A. "Contributing to by issuing permits to operate at the
Shingle Mountain location"    20

B. "Contributing to" by subsidizing the expenses of the
creation of Shingle Mountain    25

C. "Contributing to" by not removing the waste    26

D. The solid waste at Shingle Mountain presents an in imminent
and substantial endangerment to health and the environment.    26

E. Plaintiff gave the City the notice required by
42 U.S.C. § 6972(b)(2)(A)    26

III.    The City Council zoning and spending actions constitute
disparate treatment based on race and ethnicity in violation of
the 14th Amendment.    27

A. The facts establish disparate treatment based on race.    27

B. The facts of the City Council's refusal to provide non-industrial
zoning or the funding to eliminate the solid waste show prima facie
cases of disparate treatment based on race.    32

C. Additional evidence demonstrates that discriminatory intent is a factor
in the City's zoning decisions and decision to not remove the
illegal Shingle Mountain landfill waste.    33

1. There is a clear pattern of discriminatory effect.    33

2. The background of the City's zoning and permitting decisions
for the 9527 S. Central Expressway site and comparable City
decisions provide probative evidence.    34

3. The sequence of events leading up to the decision,
as compared to other decisions on comparable matters
show the City's actions harm Black and Hispanic residential
neighborhoods.    35

4. The City departed from normal City procedures and
substantive legal requirements with regards to the
Shingle Mountain property.                                      36

5. The legislative and administrative history of the City actions
at the site show that the City is not removing the illegal
Shingle Mountain landfill that it helped create.                37

6. The consistent pattern of actions of City decision-makers
have imposed much greater harm on people of color
than on Whites.                                                 38

IV.    Claims for Relief                                        39

V.     Prayer for Relief                                        40

### Introduction

1. Plaintiff Marsha Jackson brings this citizen suit under the Resource Conservation and Recovery Act (RCRA) against Defendants for their contributions of the illegal storage of solid waste and for the creation of the illegal landfill known as "Shingle Mountain." Ms. Jackson's residence is located directly adjacent to Shingle Mountain. The illegal solid waste landfill that is the subject of this amended complaint is an open dump that contains at least 198,000 cubic yards of unprocessed asphalt shingle material and roofing waste material at the landfill site. The shingles have been piled up to a hundred feet high in places and are open piles of waste with no cover. The mountain with thousands of tons of waste is so high that it can be seen from Interstate 45, over half a mile away. There are other piles of processed shingles and waste materials on the site. The debris and particulate from the shingles creates an imminent and substantial endangerment to human health and the environment. There is drainage from the unprocessed asphaltic shingle material in a pooled area of water on the site. Defendant Blue Star Recycling

accepted solid waste at the site for disposal fees and created the illegal landfill from 2018 through 2019. Defendants CCR Equity Holdings One, LLC and Mr. Chadick failed to exercise due care and contributed to the creation of the illegal landfill. Defendant City of Dallas failed to exercise due care and contributed to the creation of this illegal solid waste landfill by causing the industrial zoning for this use and by issuing a Certificate of Occupancy to the owner/operator of the site. None of the Defendants have removed the illegal landfill and the open dump remains in place.

2. Defendant City of Dallas City Council pays for the removal of environmental hazards in predominantly White non-Hispanic neighborhoods but refuses to spend City funds to remove the Shingle Mountain that is located in a predominantly Black and Hispanic neighborhood. The City Council has authorized industrial zoning to be adjacent to single family homes in Black and Hispanic neighborhoods in Dallas but does not place industrial zoning and industrial uses adjacent to residential homes in predominantly White non-Hispanic neighborhoods.

**Jurisdiction**

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a) (3), (4), and 42 U.S.C. § 6972(a)(1)(B).

**Parties**

**Plaintiff**

4. Plaintiff Marsha Jackson is a homeowner who resides at 4920 Choate Road, Dallas TX, 75241. She resides directly adjacent to the illegal solid waste landfill known as "Shingle Mountain."

5. Shingle Mountain is located on two adjoining lots. One lot is at 9505 S. Central Expressway and the other lot is at 9527 S. Central Expressway. Both lots adjoin Ms. Jackson's

4

property. She is harmed daily by living next to the open dump/landfill at this location. Her house is within 100 feet of piles of debris and solid waste on the landfill property.

**Defendants**

6. Defendant Blue Star Recycling, LLC is the operator of the illegal solid waste landfill at 9527 S. Central Expressway, Dallas, Texas, 75241. Blue Star Recycling also operated the landfill on the adjacent lot at 9505 S. Central Expressway, Dallas, Texas 75241.

7. Defendant CCR Equity Holdings One, LLC is the owner of the illegal landfill site at 9527 S. Central Expressway. This location is the main site for the illegal solid waste landfill.

8. Defendant Cabe Chadick is the Governing Member and Registered Agent for CCR Equity Holdings One, LLC.

9. Defendant, the City of Dallas is a home rule municipality in the State of Texas.

**Facts**

**I.    Defendants Blue Star Recycling LLC, CCR Equity Holdings One LLC, and Cabe Chadick contributed to the handling, storage, and disposal of illegal solid or hazardous waste at Shingle Mountain in violation of RCRA 42 U.S.C. § 6972(a)(1)(B).**

10. CCR Equity Holdings One, LLC (CCR) purchased the site at 9527 S. Central Expressway (9527 property) for the purpose of using the property for the disposal of shingles and for an illegal landfill. CCR leased the property to Blue Star Recycling (Blue Star) for the purpose of using the property as a site for the disposal of shingles and for an illegal landfill and accepted rent payments for the lease of the property for this purpose. The use of the property for the illegal storage of solid waste violates the deed restrictions for the property. Defendants Blue Star, CCR, and Mr. Chadick did not have a permit to operate a solid waste facility at this location. This use of the 9527 property for the storage of the shingles on the property, the

5

processing of the shingles on the property, and the storage of the ground shingle material constitute a substantial endangerment to health and the environment.

11. Blue Star Recycling, LLC directly contributed to the handling, storage, treatment, and disposal of solid waste as the operator of the Asphalt Shingle Recycling business at Shingle Mountain.

12. Blue Star Recycling operated the illegal landfill, charges a fee for accepting the material from third parties, and sometimes sells the processed material. This use of the property for the storage of the shingles on the property, the processing of the shingles on the property, and the storage of the ground shingle material constitute a substantial endangerment to health and the environment. Blue Star Recycling, with the consent of the owner CCR and Mr. Chadick, diverted trucks loaded with solid waste for disposal that were headed to the City of Dallas McCommas Bluff municipal solid waste landfill specifically to dump loads of solid waste on the Shingle Mountain site. These Defendants' (Blue Star, CCR, Mr. Chadick) along with Chris Ganter had an investment scheme for the use of the property as a solid waste landfill specifically included the revenue that was to be gained from the disposal fees from dumping shingles at the Shingle Mountain location. These Defendants (Blue Star, CCR, Mr. Chadick) and Chris Ganter chose the site at 9527 S. Central Expressway because it is less than a mile to the entrance of McCommas Bluff landfill and trucks pass by the site daily on the way to the McCommas Bluff landfill. Defendants (Blue Star, CCR, Mr. Chadick) and Chris Ganter lured the trucks loaded with shingles to dump the waste at the Shingle Mountain site by promising that they would avoid the lengthy wait time to deposit loads at McCommas Bluff landfill.

13. Defendants Blue Star, CCR, and Mr. Chadick intended to profit from the disposal of solid waste at Shingle Mountain. They intended to extend the profit from the revenue of disposal fees for accepting loads of waste shingles to an additional location.

14. CCR's tenant, Blue Star and Mr. Ganter began accepting truckloads of roofing shingles and solid waste at the Shingle Mountain location on or about January 2018.

15. In February 2018, Ms. Jackson complained to the City of Dallas Code Enforcement about the piles of debris being placed on the Shingle Mountain property. Blue Star continued to bring in solid waste to the property.

16. By December 13, 2018, CCR and Mr. Chadick's tenant Blue Star and Chris Ganter had accepted enough shingles to create a 15-20-ft tall, 300-foot long wall of ground-up shingle asphalt stretching approximately 30-40 feet across the entire length of the creek that is on or adjacent to the premises. The amount and placement of the waste resulted in near-complete blockage of the creek discharge of industrial and asphalt base material into the stormwater drainage system.

17. Roofing shingles, roofing shingle particles, wooden pallets, wood, industrial waste, and asphalt base were discharged into the stormwater drainage system by CCR's tenant, Blue Star.

18. CCR's tenant Blue Star caused the discharge of the industrial waste and other pollutants into the stormwater system.

19. CCR's 9527 property is an industrial facility, and a Texas Pollutant Discharge Elimination System Permit (TPDES) is required to conduct the lawful activities at the Property. CCR has no such permit.

20. CCR Equity Holdings One, LLC filed its certificate of formation on December 27, 2016. Cabe Chadick was the Registered Agent and the only Governing Person. Cabe Chadick, as the Manager of CCR Equity Management, LLC, signed the consent for CCR Equity Holdings, One, to use a similar name. Cabe Chadick is the person who files the CCR Equity Holdings One, LLC franchise tax reports as the Manager.

21. CCR, through its actions securing the property for use as the Asphalt Shingle Recycling operation and as owner of the 9527 site contributed to the handling, etc. of the Shingle Mountain solid waste.

22. CCR, through the actions of Cabe Chaddick selected the use of the CCR property as a Asphalt Recycling Facility before it purchased the property. CCR, through the actions of Cabe Chaddick, selected Blue Star Recycling and selected Chis Ganter, the operator of Blue Star Recycling, to operate the Asphalt Recycling Facility before CCR purchased the property.

23. Defendant Chadick was living in McKinney in 2017 when he needed a roof repaired. Chris Ganter did the work, and at some point brought up his interest in recycling shingles. "It was something he was going to get into," Mr. Chadick said. "He talked about the positive environmental impact and how there was a location in South Dallas he had in mind." They drove to look at the land off Highway 310, where Blue Star had begun operations on a smaller property. Defendant Chadick bought the land for $465,000. He then leased it to Blue Star for $5,500 a month for 10 years.

24. CCR is the registered TCEQ Customer for the Asphalt Recycling Facility. A TCEQ Customer is the individual or organization responsible for one or more Regulated Entities. TCEQ gives the example of a "Customer" as including owners and operators of a site or an individual who holds a license. The site is the Regulated Entity.

8

25. CCR signed a lease with Blue Star Recycling that required the property to be used only as a Asphalt Recycling Facility. The lease states that CCR leased the premises to Blue Star Recycling for "the following purpose and no other: Asphalt Shingle Recycling." Doc. 11-1, CCR App. 32.

26. CCR had the unlimited right under the lease to enter the premises for "any reasonable purpose, including but not limited to purposes for repairs, maintenance, alterations, . . ." Doc. 11-1, CCR App. 33.

27. CCR, under the lease, perfected both a lien and a security interest on all of Blue Star Recycling's property on the premises. Doc. 11-1, CCR App. 37.

28. CCR had the authority under the lease to terminate the lease for "any activity that violates any applicable federal, state, or local law, including but not limited to those laws related to air quality, water quality, hazardous materials, wastewater, waste disposal, air emissions, or other environmental matters." CCR allowed the lease to Blue Star Recycling to continue despite activities that violated this provision. Doc. 11-1, CCR App. 32.

29. Once Blue Star Recycling was in default, CCR had the authority under the lease to enter the premises and use commercially reasonable means to remove "any trash, debris, personal property, hazardous materials, or environmental contaminants left by" Blue Star Recycling. Doc. 11-1, CCR App. 36.

30. CCR and Cabe Chadick allowed its tenant Blue Star to use the Shingle Mountain property in violation of the deed restrictions governing the use of the property. Those deed restrictions limit the use of the property to wood processing and did not and do not allow for the recycling of shingles or the storage of solid waste on site. Defendants CCR, Blue Star, and Mr. Chadick did not engage in wood processing at the site.

31. CCR and Cabe Chadick allowed its tenant to use the Shingle Mountain property even though it is located, in whole or in significant part, within the l00-year floodplain as defined by the Federal Emergency Management Agency (FEMA) and identified on that agency's Flood Insurance Rate Map.

32. CCR claims to have taken no action to determine what Blue Star Recycling was up to and its representative Chadick rarely visited the 9527 property.

33. CCR claims that it had no knowledge that shingles and reprocessed shingles were accumulating at the 9527 property.

34. Defendant CCR, as an entity responsible for the operation of the TCEQ regulated entity on CCR's property, contributed to the handling, storage, treatment, or disposal of any solid waste by the above described failures to act and actions which constitute the failure to exercise due care over the operation of the Asphalt Recovery Facility located on the CCR property

35. Defendant Chadick, as the sole person responsible for CCR contributed to the handling, storage, treatment, or disposal of any solid waste by the above described failures to act and actions which constitute the failure to exercise due care over the operation of the Asphalt Recovery Facility located on the CCR 9527 property.

36. Chris Ganter also directly contributed to the handling, storage, treatment, and disposal of solid waste of the Shingle Mountain solid waste as the operator of the Asphalt Shingle Recycling business at Shingle Mountain.

**A. The asphalt shingle material at Shingle Mountain is solid waste.**

37. The asphalt shingles at the CCR property are discarded solid materials that have been stripped from buildings and are treated as waste, refuse, trash, and garbage.

38. The CCR property was registered with the Texas Commission on Environmental Quality as a Municipal Solid Waste non-Permitted facility.

39. The application for the registration was a Notice of Intent (NOI) to Operate a Municipal Solid Waste Recycling Facility. The application stated:

> The intended waste stream for the Recycling Facility will primarily emanate from manufacturers, commercial operators, and small- to mid-sized construction contractors in the North Texas region

40. The application for the registration identified the operation of the facility as involving solid waste. The application listed the following codes describing the operation of the facility:

> SIC 4953: Refuse Systems;
> NAICS 56211 - Waste Collection;
> NAICS - Material Recovery Facilities engaged in operating facilities for separating and sorting recyclable materials from nonhazardous waste streams (i.e., garbage) . . .

41. The City of Dallas and the State of Texas classify the asphalt shingles at the CCR property as solid waste.

## B. The Defendants Blue star, CCR, and Mr. Chadick use the site for an illegal solid waste landfill.

42. The Defendants Blue Star, CCR One, and Chadick use the site for an illegal solid waste landfill. Defendants Blue Star, CCR, and Mr. Chadick contributed to the handling, storage, and disposal of illegal solid or hazardous waste at Shingle Mountain by their actions in creating an illegal landfill and open dump.

43. The open dump known as "Shingle Mountain" is the subject of this RCRA citizen's suit. This illegal solid waste landfill contains at least 198,000 cubic yards of unprocessed asphaltic shingle material with associated packaging and roofing waste material at the landfill site in a single stockpile. There are other piles of processed shingles and waste materials on the site. There is drainage from the unprocessed asphaltic shingle material in a pooled area of water

11

on site that is dark amber in color and suggestive that petroleum-based compounds may be present.

44. The piles of shingles and waste materials are from at least 60 to 100 feet tall and the waste piles cover most of the 4.3 acres of the 9527 property. See Exhibit 1 to the Amended Complaint, the TCEQ photographs of the Shingle Mountain site.

45. Defendants CCR Equity Holdings One, LLC, Cabe Chadick, and Blue Star Recycling, LLC along with Chris Ganter contributed to the illegal handling, treatment, storage and disposal of solid waste at the Shingle Mountain site. When Defendant Cabe Chadick was having his roof repaired in 2017, Mr. Chadick met Chris Ganter who did the repair work on his roof. Chris Ganter informed Mr. Chadick about the process of recycling of roofing shingles and that Ganter was going to start a business of obtaining waste roofing shingles and potentially recycling them. Chris Ganter had a site in mind in southern Dallas for the disposal of the shingles and told Cabe Chadick about it. Mr. Chadick and Mr. Ganter drove to look at the land at 9527 S. Central Expressway. CCR through the actions of Cabe Chadick bought this property for the express purpose of leasing it to Blue Star Recycling and for the express purpose of accepting the disposal of solid waste at the site.

46. Blue Star and Mr. Ganter stated and projected that the expected revenue from accepting loads of shingles solid waste at the properties that became Shingle Mountain would be $100,000 per month.

47. Defendants intended to profit from the disposal of solid waste at Shingle Mountain. They intended to extend the profit from the revenue of disposal fees for accepting loads of waste shingles to an additional location. In July 2019, after Defendants had already created Shingle Mountain at 9527 S. Central Expressway, an entity named CCR Equity Holdings Five, LLC

12

selected a Denton location to dispose of shingles solid waste at that site. Defendant Cabe

Chadick is also the governing member of CCR Equity Holdings Five, LLC. Chris Ganter, the

operator of Blue Star Recycling, publicly represented that he was a principle in CCR Equity

Holdings Five, LLC. Defendants profited from the illegal disposal and storage of solid waste at

the Shingle Mountain location.

48. Despite knowledge of imminent and substantial endangerment to health and the

environment from the illegal landfill at the Shingle Mountain property, Defendants have failed to

take steps to protect the public health, safety, and welfare by taking action to remove the landfill

and clean up the Shingle Mountain property.

49. Defendants CCR and its governing member Cabe Chadick have not removed the

waste. The property remains in violation of RCRA, 42 U.S.C. § 6972(a)(1)(B) and continues to

present imminent and substantial endangerment to Ms. Jackson, her neighbors, the public health

and the environment.

50. By failing to take action to remove the landfill, Defendants CCR and its governing

member Cabe Chadick are contributing to and causing harm to Ms. Jackson and to the adjoining

residential neighborhood.

51. Despite knowledge of imminent and substantial endangerment to health and the

environment from the illegal landfill at the Shingle Mountain property, Blue Star Recycling has

failed to take steps to protect the public health, safety, and welfare by taking action to remove the

landfill and clean up the property. The managing members of Blue Star Recycling have not

removed the waste despite being ordered to do so by state court order. The property remains in

violation of the RCRA 4 U.S.C. § 6972(a)(1)(B) and continues to present imminent and

substantial endangerment to Ms. Jackson, her neighbors, the public health and the environment.

52. By failing to take action to remove the landfill, Blue Star Recycling is contributing to and causing harm to the adjoining residential neighborhood.

C. **The storage and processing of the shingle materials constitutes a substantial endangerment to health and the environment.**

53. Blue Star Recycling filed an application with the State of Texas Commission on Environmental Quality (TCEQ) admitting the shingle material stored at 9527 S. Central Expressway was combustible and a fire hazard. The TCEQ Municipal Solid Waste division considers asphalt shingles to be a combustible material based in part on the occurrence of fires at sites storing and processing shingle material.

54. The OSHA standards for processing shingles show the materials at Shingle Mountain and the processing of the shingles materials constitute a substantial endangerment to health and the environment. The U.S. Occupational Safety and Health (OSHA) regulation 29 C.F.R. § 1916.1200 Safety Data Sheet is required for the handling of shingle materials. It states that the shingle material when reduced to dust contains three carcinogens - asphalt, quartz, and titanium oxide - that can be inhaled absent protective equipment. OSHA requires the prevention and control of dust emitted by operations involving shingle material. OSHA prohibits allowing large quantities of shingle material to reach ground water, water courses or a sewage system. OSHA warns that "The user of this material has the responsibility to dispose of unused material, residues and containers in compliance with all relevant local, state and federal laws and regulations regarding treatment, storage and disposal for hazardous and nonhazardous wastes."

55. The State of Texas has found that the Defendants' use of the property as an illegal landfill constitutes a substantial endangerment to health and the environment.

56. The City of Dallas has found violations of the City of Dallas health and safety codes by the Defendants' use of the site that constitute a substantial endangerment to health and the environment. The City has found the following violations by Defendants concerning Shingle Mountain:

a. Discharging industrial waste into the storm sewer;

b. Discharging one or more air contaminants in such concentration and of such duration as are or may tend to be injurious to or adversely affect human health or welfare, animal life, vegetation, or property; or as to interfere with the normal use or enjoyment of animals, vegetation, and property;

c. Causing, suffering, allowing, or permitting visible emissions from an unpermitted source;

d. Placing, depositing, or throwing; permitting to accumulate; or permitting to be placed, deposited, or thrown, any litter on the premises or on the parkway adjacent to the premises;

e. Permitting any yard, grounds or premises belonging to or controlled or occupied by the owners and operator to become, from any cause, nauseous, foul, offensive or injurious to the public health, or unpleasant and disagreeable to adjacent residents or persons;

f. Carrying on a trade, business, or occupation within the City that is injurious to the health of those who reside in the vicinity, or suffering any substance which shall have that effect to remain on the owner/operator's premises, in the owner/operator's possession, or under the owner/operator's control;

g. Failure to comply with a stormwater permit;

h. Discharging or allowing or permitting the discharge of industrial waste into the stormwater drainage system;

i. Discharging or allowing or permitting the discharge of asphalt base material into the stormwater drainage system;

j. Discharging or allowing or permitting the discharge of a harmful quantity of dust, resulting from grinding, cutting, or storage of materials, into the stormwater drainage system;

k. Failure to employ best management practices to control and minimize the discharge of materials and substances handled, stored, and generated by Blue Star into the stormwater drainage system;

l. Failure to eliminate or reduce exposure of garbage and refuse materials to precipitation or runoff prior to disposal; and

m. Placing, storing, and maintaining construction equipment within the l00-year flood plain.

57. The illegal landfill is an open dump that attracts varmints, vermin and other animals creating a threat to the health and safety of Ms. Jackson and her neighbors.

58. The illegal landfill is posing a threat to the health of Ms. Jackson and to others residing near Shingle Mountain. The debris stored on site is an open dump without cover. The debris causes fiber, glass, and other particles to permeate the air and blow onto adjoining properties such as Ms. Jackson's home. The black dust caused by the illegal landfill creates breathing problems for Ms. Jackson as this black dust had entered her home and property. Other citizens have complained of poor air quality resulting in black dust permeating the air they were breathing.

59. The City of Dallas has received several complaints from Ms. Jackson and other individuals residing near Shingle Mountain. The nature of the complaints made to the City of Dallas are regarding poor air quality and odor at their properties surrounding Blue Star's illegal

16

landfill. In particular, the residents have complained of poor air quality resulting in black dust permeating the air they were breathing.

### D. Plaintiff's Notices of Intent to File RCRA Citizens' Suit for violations of 42 U.S.C. § 6972(a)(1)(B).

60. On December 4, 2019, Plaintiff gave Defendant CCR Equity Holdings One, LLC and Cabe Chadick notice of intent to file a citizen's suit pursuant to the Resource Conservation Recovery Act (RCRA) by mailing the notice registered mail to the governing member and registered agent for CCR Equity Holdings One, LLC. Plaintiff's notice of intent to file a citizen suit was sent to Defendant CCR Equity Holdings One, LLC and Cabe Chadickick by registered mail, return receipt requested. It was addressed to CCR Equity Holdings One, LLC, the owner of the illegal landfill and addressed to Cabe Chadick, the governing member and registered agent for CCR Equity Holdings One, LLC. A copy of the notice was also mailed to the Administrator of the Environmental Protection Agency, the Region 6 Administrator of the Environmental Protection Agency, and the Executive Director of Texas Commission for Environmental Quality as the chief administrative officer of the solid waste management agency of Texas. The content of Plaintiff's notice informed Defendant CCR Equity One, LLC and Cabe Chadick of the substance of the owner's contributions to the illegal storage, disposal, and handling of solid waste at Shingle Mountain which presents an imminent and substantial endangerment to health or the environment in violation of 42 U.S.C. § 6972(a)(1)(B). More than 90 days have expired since Plaintiff gave notice to Defendant CCR Equity Holdings One, LLC and its governing member and registered agent Cabe Chadick of the Citizen Suit action in accordance with 42 U.S.C. § 6972(b)(2)(A).

61. Plaintiff also provided notice of intent to file a RCRA citizen suit on November 26, 2019 to Defendant CCR Equity Holdings One, LLC and Cabe Chadick by mailing the notice registered mail to the governing member and registered agent for CCR Equity Holdings One, LLC. The notice was sent to both CCR Equity Holdings One, LLC and its Governing Member and Registered Agent Cabe Chadick and to Cabe Chadick. A copy of the notice was also mailed to the Administrator of the Environmental Protection Agency, the Region 6 Administrator of the Environmental Protection Agency, and the Executive Director of Texas Commission for Environmental Quality as the chief administrative officer of the solid waste management agency of Texas. The content of Plaintiff's notice informed Defendant CCR Equity One, LLC and Cabe Chadick of the substance of the owner's contributions to the illegal storage, disposal, and handling of solid waste at Shingle Mountain which presents an imminent and substantial endangerment to health or the environment in violation of 42 U.S.C. § 6972(a)(1)(B). More than 90 days have expired since Plaintiff gave notice to Defendant CCR Equity Holdings One, LLC and its governing member and registered agent Cabe Chadick of the Citizen Suit action in accordance with 42 U.S.C. § 6972(b)(2)(A).

62. Plaintiff provided Blue Star Recycling, LLC with a Notice of Intent to file a Citizen's Suit pursuant to RCRA on November 26, 2019. Plaintiff's notice of intent to file a citizen suit was sent to Defendant Blue Star Recycling, LLC by registered mail, return receipt requested. It was addressed to Blue Star Recycling, LLC, the operator of the illegal landfill and addressed to Carl Wayne Orrell, the registered agent and managing member for Blue Star Recycling, LLC. A copy of the notice was also mailed to the Administrator of the Environmental Protection Agency, the Region 6 Administrator of the Environmental Protection Agency, and the Executive Director of Texas Commission for Environmental Quality as the chief administrative officer of the solid

18

waste management agency of Texas. The content of Plaintiff's notice informed Defendant Blue Star Recycling, LLC of the substance of Blue Star Recycling, LLC's contributions to the illegal storage, disposal, and handling of solid waste at Shingle Mountain which presents an imminent and substantial endangerment to health or the environment in violation of 42 U.S.C. § 6972(a)(1)(B). More than 90 days have expired since Plaintiff gave notice to Defendant Blue Star Recycling, LLC of the citizen suit in accordance with 42 U.S.C. § 6972(b)(2)(A).

63. Plaintiff has provided personal service of a Notice of Intent to file a RCRA Citizen's Suit to Chris Ganter and will seek leave of Court to amend the complaint to add Chris Ganter when the ninety day notice period expires.

64. Plaintiff gave the City notice of intent to file a citizen's suit required by 42 U.S.C. § 6972(b)(2)(A) on November 26, 2019. The Notice was provided to the City Manager and to the Mayor of Dallas by registered mail, return receipt requested. A copy of the notice was also mailed to the Administrator of the Environmental Protection Agency, the Region 6 Administrator of the Environmental Protection Agency, and the Executive Director of Texas Commission for Environmental Quality as the chief administrative officer of the solid waste management agency of Texas. The content of Plaintiff's notice informed Defendant City of Dallas of the contributions to the illegal storage, disposal, and handling of solid waste at Shingle Mountain which presents an imminent and substantial endangerment to health or the environment in violation of 42 U.S.C. § 6972(a)(1)(B). More than 90 days have expired since Plaintiff gave notice to Defendant City of Dallas.

**II.    The City has contributed to the past and present handling, storage, treatment, transportation, or disposal of the asphalt shingle solid waste at Shingle Mountain.**

65. The City has contributed to the past and present handling, storage, treatment, transportation, or disposal of the asphalt shingle solid waste at Shingle Mountain. The solid waste includes asphalt shingle material that has been grinded into small particles. The Shingle Mountain solid waste presents an imminent and substantial endangerment to health or the environment as admitted by the City.

66.The City has contributed to the past and present handling, storage, treatment, transportation, and disposal of the asphalt shingle solid waste at Shingle Mountain in three ways. The City issued the permits to operate the facility in violation of deed restrictions and related zoning code provisions prohibiting this use on the site. ¶¶ 67- 76. The City has subsidized the expenses of the creation and operation of Shingle Mountain by exempting the facility from the expenses that would have been required to avoid the risks of imminent and substantial endangerment to health or the environment.  ¶¶ 77-78. The City of Dallas has the legal power to require the removal of Shingle Mountain. It can summarily abate the use because it is located within the floodplain but it has not done so. ¶¶ 79-80.

**A. "Contributing to by issuing permits to operate at the Shingle Mountain location"**

67. The CCR Equity One site had not been used to store and process asphalt shingles before CCR Equity One bought the site to be used for that purpose. Before the site could be used for that purpose, CCR Equity Holdings One, LLC (CCR) or its tenant, Blue Star Recycling, LLC, (Blue Star) had to obtain a Certificate of Occupancy (CO) from the City of Dallas.[1] In

---

[1] SEC. 51A-1.104.   CERTIFICATE OF OCCUPANCY.
Except as provided in Section 306.1, "Use or Occupancy," of Chapter 52, "Administrative Procedures for the Construction Codes," a person shall not use or occupy or change the use or occupancy of a building, a portion of a building, or land without obtaining a certificate of occupancy from the building official in compliance with Section 306, "Certificate of

order to obtain the CO, CCR or Blue Star had to show that the use would comply with the City

of Dallas Development Code (the Zoning Ordinance) or "other city ordinances, rules, or

regulations, or any county, state, or federal laws or regulations."[2]  CCR or Blue Star had to

obtain a City inspection before the CO could be issued.[3]  Until the CO was issued, any attempt to

start operation could be easily stopped by the City and no public utilities would be available to

the site.

68. The City Code substantive and procedural steps that were required and were not

enforced at Shingle Mountain are shown by comparison with the zoning request for a similar

outside shingle salvage and reclamation use located across S. Central Expressway and just to the

south of Shingle Mountain. The address of this property is 9500 S. Central Expressway. There

were no single-family homes or any residential units next to this site. The shingle salvage and

Occupancy," of Chapter 52, "Administrative Procedures for the Construction Codes," of the
Dallas City Code.  (Ord. Nos. 19455; 21735; 22204; 24439; 26579; 29023).

[2] 52A-306.5 Denial. The building official **shall deny** an application for a certificate of occupancy
if the building official determines:

1. The certificate of occupancy requested **does not comply** with the codes, the Dallas
Development Code, other city ordinances, rules, or regulations, or any county, state, or
federal laws or regulations;

2. The information, plans, diagrams, computations, specifications, or other data or
supporting documents submitted with the application clearly show that the use or
occupancy will **be operated in violation** of the codes, the Dallas Development Code, other
city ordinances, rules, or regulations, or any county, state, or federal laws or regulations;

3. The application contains **false, incomplete, or incorrect** information and the applicant has
failed to correct or supplement the false, incomplete, or incorrect information within a
reasonable time after the building official requests that the information be corrected or
supplemented; or

4. The applicant does not possess a required city, county, **state**, or federal license, permit, or
registration to operate the use or occupancy. (Ord. 26579) (emphasis added).

[3] 306.4.2 Application not submitted in conjunction with an application for a construction permit.
An application for a certificate of occupancy that is not submitted in conjunction with an
application for a construction permit shall expire and be void ab initio if:

1. no inspection is requested by the applicant before the 120th day after the date of its filing . . .

reclamation use at this location was by Southwest Shingle Recycling, LLC (Southwest Shingle).
Like the operation at Shingle Mountain, Southwest Shingle salvaged and reclaimed asphalt
composition shingles. Southwest Shingle was also permitted for salvage and reclamation of
wood shingles. Southwest Shingle was located in an IM Industrial Manufacturing District
without any adjacent single-family homes or other residential units. The City of Dallas Zoning
Code requires a Specific Use Permit (SUP) for the outside salvage and reclamation use. The SUP
process requires a more intensive and specific review by the Dallas City Council. It is in effect,
an amendment to the base zoning in the location that adds conditions over and above those
governing other uses in the IM districts. The SUP can be limited in duration. There must be
notice to nearby property owners and public hearings before the City Plan Commission and the
City Council. Only the City Council has the authority to approve an SUP. City of Dallas
Development Code SEC. 51A-4.219. SPECIFIC USE PERMIT (SUP).

69. Southwest Shingle went through the entire SUP process as required for outside
salvage and reclamation uses. The SUP Southwest Shingle obtained was limited in duration. The
SUP required: compliance with a specific site plan, fencing, landscaping, dust control, limited
access and egress, maximum material stacking height of nine feet, and compliance with all
relevant local, state and federal laws. [Z101-131(WE)]. Once the process was completed,
Southwest Shingle was issued the required COs. The COs specifically noted the additional
requirements imposed by the SUP.

> NO BUILDING ON SITE. Outside salvage and reclamation of wood and
> composition roofing shingles only. Must comply with SUP 1395, expires May 25,
> 2014. Water system consisting of sprinklers controlled by timers must be
> installed. Materials may not be stacked higher than 9 ft, except that materials
> within 40 feet of the visual screen may not be stacked higher than 8 feet. CO.

70. In addition, Deed Restrictions are also imposed by the City of Dallas as a condition for granting the SUP. There were no deed restrictions on Southwest Shingle but there are deed restrictions on CCR's land. As set out below, the City did not follow the deed restrictions on CCR's property when it issued a CO to the operator of the Blue Star shingle facility.

71. The City of Dallas did not follow any of the required procedures or apply any of the substantive standards for outside recycling and reclamation to the CCR property. CCR or Blue Star applied for COs without applying for the required SUP or going through the public application process mandated by the SUP process. CCR or Blue Star applied for COs without complying with the deed restrictions which did not include outside recycling and reclamation as a permitted use on CCR's property. Ms. Jackson, who resides immediately adjacent to CCR's property, did not receive any notice that the asphalt shingle recycling and reclamation use would be permitted nor did she have any opportunity to oppose CCR or Blue Star's use. None of the other single-family homeowners in the area received notice or the opportunity to oppose the use.

72. The City did not impose any of the requirements on CCR or Blue Star that the City had imposed on Southwest Shingle. There was no site plan, no required fencing, no landscaping, no dust control, no limited access and egress, no limitation on operating hours, no maximum stacking height, and no required compliance with other local, state, and federal laws.

73. In order to show compliance with the City Development Code and related governing documents, CCR or Blue Star should have been required to show compliance with the City of Dallas imposed Deed Restrictions governing the use of the site. As set out below, these Deed Restrictions were imposed by the City in 2007 to allow a nuisance wood processing facility to move from a location where the City and State were citing it for nuisance conditions to Ms. Jackson's single family residential neighborhood. As a result, the site was covered by Deed

23

Restriction Z-067-152. Compliance with the Deed Restriction was an explicit condition for the issuance of a CO. [4] The Deed Restriction did not allow any outside salvage or reclamation uses. The deed restriction allowed only one use by SUP - wood processing. CCR or Blue Star could not have operated under these restrictions. CCR or Blue Star did nothing to change the deed restrictions. The City did nothing to enforce the deed restrictions. The deed restrictions would have required the City to do a Residential Adjacency Review for such a use.

74. The difference in treatment by the City to the industrially zoned property adjacent to Ms. Jackson that created Shingle Mountain and the Southwest Shingle location was accompanied by different results. Southwest Shingle had two complaints. Both were investigated. Neither investigation found violations. Southwest Shingle is no longer in operation. The Southwest Shingle site was cleaned up, paved, rezoned Commercial Services, and is currently used by a trucking company.

75. CCR's site has been the subject of many complaints to City and State authorities. The resulting investigations found violations. Thousands of tons of asphalt shingle material contribute to the risks of fires and other nuisances. The City is now suing to remedy the illegal landfill that the City could have stopped before it began operation simply by following its own zoning and related rules. The State is now suing to remedy the illegal landfill that the City could have stopped before it began operation simply by following its own zoning and related rules.

76. The City, by allowing the use in direct violation of the deed restriction and the related provision contributed to the past and present handling, storage, treatment, or disposal of solid or

---

[4] "For further remedy, the Owner agrees that the City may withhold any certificate of occupancy or final inspection necessary for the lawful use of the Property until these restrictions are complied with." VI, 71083.

hazardous waste that caused the creation of the Shingle Mountain illegal landfill which presents

an imminent and substantial endangerment to health and the environment in violation of 42

U.S.C. § 6972(a)(1)(B).

**B. "Contributing to" by subsidizing the expenses of the creation of Shingle Mountain**

77. The City issued a CO to the owner/operator of Shingle Mountain in violation of its

substantive processes and standards and in violation of the existing deed restrictions on the 9527

property.

The City, by exempting CCR and BSR from the substantive standards for operation of an

outside recycling and reclamation use, contributed an indirect subsidy to CCR and CCR's tenant,

Blue Star. Neither CCR as the owner of the site nor Blue Star as an operator of the site had to:

- pay for the required site plan,
- pay for the installation and maintenance of the required fencing,
- pay for the installation and maintenance of the required landscaping,
- pay for the installation, operation, and maintenance of the required dust control measures,
- incur the costs of delays cause by enforcing limited access and egress,
- incur the costs imposed by limitation on operating hours, and
- incur the substantial loss of revenue caused by compliance with the required eight to nine foot maximum stacking height by turning away paying customers in order to maintain the limits.

78. The reduction in expenses allowed BSR to either reduce its fees below the

competitive rates charged either by the City landfill or by other privately owned recyclers and

obtain more disposal fees or to make more profit by charging the same disposal fees. In either

case, the City's exemptions increased the cash flow from the operation of the Shingle Mountain

site. This subsidy contributed to the past and present handling, storage, treatment, or disposal of

solid or hazardous waste that caused the creation of the Shingle Mountain illegal landfill which

presents an imminent and substantial endangerment to health and the environment in violation of 42 U.S.C. § 6972(a)(1)(B).

**C. "Contributing to" by not removing the waste**

79. The City of Dallas has the legal power to require the removal of Shingle Mountain. It can summarily abate the use because it is located within the floodplain. The use is not one allowed by the City in a flood plain. Texas law gives the City of Dallas the power to abate the violation by causing the work necessary to do so after notice and an opportunity to comply to the owner. If the owner, as in this case fails to comply, the City, without legal action, may pay for and cause the work to be done and assess the costs to the owner. Until the costs are paid, interests at 10 percent per year and the City has a lien on the property for the costs incurred and the interest. Tx. Local Gov't Code. § 54.020.

80. The City has given the owner the required notice and opportunity to comply but has not taken any action to cause the work necessary. State law gives the City the power to summarily stand in the place of the owner and remove the material from the floodplain. The City refuses to do so. Just as the owner's refusal to remove the material contributes to the imminent and substantial endangerment to public health and the environment, so does the City.

**D. The solid waste at Shingle Mountain presents an in imminent and substantial endangerment to health and the environment.**

81. The solid waste at Shingle Mountain presents an in imminent and substantial endangerment to health and the environment. The imminent and substantial endangerments to health and the environment from the Shingle Mountain solid waste are described in ¶¶ 53-59.

**E. Plaintiff gave the City the notice required by 42 U.S.C. § 6972(b)(2)(A).**

82. Plaintiff gave the City the notice required by 42 U.S.C. § 6972(b)(2)(A) on November 26, 2019. Plaintiff served the Mayor of the City of Dallas, the City Manager of the City of Dallas, Executive Director of the Texas Commission on Environmental Quality, the Administrator of the U.S. Environmental Protection Agency, and the Region 6 Regional Administrator of the U.S. Environmental Protection Agency with the required notice of intent to sue for the City's actions pursuant to 42 U.S.C. § 6972(a)(1)(B). The notice complied with the requirements of 42 U.S.C. § 6972(b)(2)(A) by giving notice of the endangerment. There are no 42 U.S.C. § 6972(b)(2)(C) actions by the State that would bar Ms. Jackson's claim.

### III.    The City Council zoning and spending actions constitute disparate treatment based on race and ethnicity in violation of the 14th Amendment.

83. The City Council of Dallas has the exclusive power to:

- enact zoning ordinances including specific use permits and deed restrictions,
- set zoning including specific use permits and deed restrictions for each parcel of land in the City,
- authorize the expenditure of City funding for the removal of the solid waste from the Shingle Mountain property.

### A.  The facts establish disparate treatment based on race.

84.  Ms. Jackson is Black and her single-family neighborhood is Black and Hispanic. The U.S. census tract for the location of her residence is 86.5% Black. The smaller census block group is 90% Black. There are 513 owner occupied homes in the block group of which 382, 74%, are owner occupied. Her house is immediately adjacent to both parcels upon which Shingle Mountain operated. Her house and the other homes immediately adjacent to Shingle Mountain were built from 1940 through 1942.

27

85. Ms. Jackson's injuries from the past and present conditions of Shingle Mountain are set out in ¶ 93.

86. Shingle Mountain's existence and the resulting injuries were caused by City of Dallas City Council action establishing the Industrial Manufacturing zoning for both parcels used as the site of Shingle Mountain. Absent this action, the City staff employees would not have been able to issue occupancy permits for the operation of Shingle Mountain. The City staff employees issued occupancy permits based on uses allowed by the Industrial Manufacturing zoning for both parcels used for Shingle Mountain. While the City has claimed to have revoked the permits, the City has taken none of the summary action authorized to prevent uses conducted without a valid Certificate of Occupancy.

87. The City of Dallas City Council refuses to change the Industrial Manufacturing zoning for either or both of the parcels used as the site of Shingle Mountain. Even if the current use is ended and remedied, the continued Industrial Manufacturing zoning for the parcels presents a serious and imminent risk that another nuisance use for which Industrial Manufacturing zoning is required will be put in place adjacent to Ms. Jackson's home.

88. The solid waste of Shingle Mountain continues to be in place adjacent to Ms. Jackson's home because the City of Dallas City Council has refused to approve and obligate City funds to remove the hundreds of thousands of cubic yards of asphalt shingles and processed asphalt shingle material from the site. Ms. Jackson, other citizens of Dallas, and the Dallas City Manager have requested that the City Council approve and obligate funds for this purpose. The City Council has refused to approve and obligate funds to remove all or part of the asphalt single solid waste from the Shingle Mountain site.

89. The City Council originally placed and currently maintains Industrial Manufacturing zoning on the Shingle Mountain site with knowledge that the site is immediately adjacent to single family homes. The homes existed prior to the industrial zoning being place on the Shingle Mountain site.

90. When the City increased the intensity of the industrial uses allowed on the site, it did so after finding that the uses would be incompatible with the adjacent single-family homes and the general plan for the area.

> The proposed use is compatible with those uses; however, there are single-family uses adjacent to the northwest on Choate Street and approximately 500 feet to the north across Central Expressway. These single-family uses may be considered incompatible with the proposed use.

91. The City Council does not allow industrial zoning adjacent to predominantly White non-Hispanic single-family neighborhoods. The City has not granted a permit to operate an industrial landfill, wood processing or recycling use adjacent to predominantly White non-Hispanic single-family neighborhoods.

92. The City Council does not take zoning and permitting actions that contribute to the presence of illegal landfill uses in or adjacent to predominantly White non-Hispanic residential single-family neighborhoods. The City does not issue permits in violation of deed restrictions and does not impose heavy industrial zoning adjacent to single family homes in predominantly White non-Hispanic residential neighborhoods. There are no Shingle Mountains or any illegal landfills in a predominantly White non-Hispanic residential neighborhoods in Dallas. There is no industrial zoning and accompanying industrial uses adjacent to predominantly White non-Hispanic neighborhoods in Dallas with only one limited exception. This is because of official

29

City Council actions. The limited exception is in mixed race census tract that is 47% Black and Hispanic.

93. Ms. Jackson is injured by the City's refusal to remove the illegal landfill. She is harmed by the polluting effects of the Shingle Mountain landfill on her and her family's health and on the environment. She is harmed by the effect of the illegal landfill on her property value. The air quality of her home has been injured by the effects of the uncovered open dump known as Shingle Mountain.

94. The City Council acts and spends City funds to remove environmental problems in predominantly White non-Hispanic areas. For example, in 2015 the City paid $2.5 million of City tax-payer money to remove the Argos concrete plant from Trinity Groves. The Trinity Groves census block group location had become predominantly White as a result of the gentrification and redevelopment of the area for shopping, restaurants and housing. The City Council approved a resolution to pay to relocate Argos to a location in a predominantly Black and Hispanic neighborhood in West Dallas.

95. The City Council authorized the expenditure of $2.5 million of City funds consisting of City Bond Funds and General Obligation Commercial Paper Funds for the relocation of Argos Ready Mix (South Central) Corporation's Corp. operation in the Trinity Groves area to a new location near a Black and Hispanic single-family neighborhood. The City funding was both for the relocation and for the construction of new cement factory facilities at the new site.

96. The City stated that the existing Argos cement operation was viewed as 'eyesore' and incompatible with redevelopment efforts of Trinity Groves. The City stated that the relocation would "improve air quality" and "eliminate a non-conforming use and eyesore at the foot of Margaret Hunt Hill Bridge."

97. Ms. Jackson has requested that the City itself remove the Shingle Mountain illegal landfill. The City has refused to use its own funds and resources to remove Shingle Mountain and remediate the site. In September 2019, the City Council refused to provide funds for the removal and remediation of Shingle Mountain.

98. Ms. Jackson has informed the City of the poor air quality she experiences from the illegally stored shingle solid waste. The City is aware of the polluted air quality caused by the illegal storage of solid waste at Shingle Mountain. The City is aware of the bad air quality suffered by Ms. Jackson and by the residents in her neighborhood from Shingle Mountain. The City's removal of Shingle Mountain would improve air quality and remove a substantial endangerment to health and the environment.

99. The City has the authority to enter onto the Shingle Mountain site and remove the illegally stored waste but has not done so.

100. In the RCRA Citizen's Suit Notice to the City, Ms. Jackson informed the City that Certificates of Obligation could be issued for payment of the relocation of the Shingle Mountain off of the current site and into the City's McCommas Bluff Landfill. Such funds could be used for the environmental remediation of the site. A certificate of obligation is a debt instrument that can be issued by a city to: (1) pay for the construction of a public work; (2) purchase materials, supplies, equipment, machinery, buildings, land, and right-of-way for authorized needs and purposes; and (3) pay contractual obligations for professional services. Certificates of obligation function similarly to bonds, but do not need to be approved by the voters.

101. The City Council expended over $1 million in City funds to provide for the removal of lead soil contamination for the construction of Belo Garden park downtown. The location is predominantly White non-Hispanic both by U.S. census tract and by census block group.

102. The City Council has expended City funds for environmental remediation of other projects in predominantly White non-Hispanic neighborhoods in Dallas.

103. The City of Dallas City Council is the official policymaker for the zoning decisions in the City. The City Council is the official policymaker for the decision to expend City of Dallas funds for any environmental remediation.

104. The City of Dallas actions were taken pursuant to official municipal policy and has caused injury to Ms. Jackson in violation of 42 U.S.C.§ 1983.

**B. The facts of the City Council's refusal to provide non-industrial zoning or the funding to eliminate the solid waste show prima facie cases of disparate treatment based on race.**

105. Ms. Jackson's neighborhood is Black and Hispanic and is eligible for nonindustrial zoning. The City provides nonindustrial zoning adjacent to predominantly White non-Hispanic residential neighborhoods. The City Council placed industrial zoning on her property and increased it to heavy industrial zoning despite knowing of the adjacent single-family homes. The City issued permits to operate the industrial use next to her home that became Shingle Mountain based on the industrial zoning. There are no industrial use landfills in predominantly White non-Hispanic residential neighborhoods in the City. Plaintiff's home and her neighborhood remains eligible for non-industrial zoning. The facts set out in this complaint provide the facts for the prima facie case.

106. Ms. Jackson's neighborhood is Black and Hispanic and is eligible for City Council funding to eliminate the harmful health and environmental effects of the City Council industrial zoning. The City Council provides City funding to eliminate environmental hazards with adverse effects on predominantly White non-Hispanic neighborhoods. Ms. Jackson has requested such funding from the City Council. The City has denied the request. Her neighborhood remains

eligible for and in need of the funding. The City's stated reason for the decision is that it wants to minimize the cost on City tax funds. This reason is pretextual. The City Council's funding for remediating such environmental harms in White non-Hispanic neighborhoods uses City tax funds. The facts set out in this complaint provide the facts for the prima facie case.

**C. Additional evidence demonstrates that discriminatory intent is a factor in the City's zoning decisions and decision to not remove the illegal Shingle Mountain landfill waste.**

107. The *Village of Arlington Heights* factors provide further evidence of discriminatory intent in this case. Under *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266-68 (1977), many different kinds of evidence are relevant to the showing of intent and should be assessed on a cumulative basis. The Supreme Court sets out the following non-exclusive factors that can be probative of discriminatory intent. These factors are:

- Statistics demonstrating a clear pattern of discriminatory effect
- The historical background of the decision and other decisions on comparable matters
- The sequence of events leading up to the decision, as compared to other decisions on comparable matters
- Departures from normal procedures or substantive conclusions
- Relevant legislative or administrative history; and
- Consistent pattern of actions of decision-makers that impose much greater harm on people of color than on Whites.

108. As set out below, the Arlington Heights factors taken collectively demonstrate that the City acted, at least in part, because of race or color of Ms. Jackson and her neighborhood.

**1. There is a clear pattern of discriminatory effect.**

109. The discriminatory impact of the illegal landfill use is stark. No White non-Hispanic residential neighborhood in the City of Dallas is adjacent to an illegal landfill, let alone one the size and scale of Shingle Mountain.

110. Despite City standards prohibiting industrial zoning adjacent to single family residential homes, only Black and Hispanic residential neighborhoods are burdened by the adjacency of the City's industrial IR and IM zoning. There is no IR or IM zoning adjoining a predominantly White non-Hispanic neighborhood in the City of Dallas with only one limited exception. The statistical significance of the disparity based on race is clear.

**2. The background of the City's zoning and permitting decisions for the 9527 S. Central Expressway site and comparable City decisions provide probative evidence.**

111. The City Council helped to move BMB Ltd., an industrial wood processing use, that was operating several miles away at another location in the City to the 9527 S. Central property in 2007. The City knew the wood processing use was a nuisance because the City had investigated BMB Ltd. at its prior location and because of the TCEQ order entered against BMB for operating the wood processing facility without proper controls. The City Council increased the zoning on the 9527 property to the heaviest industrial zoning category despite knowing of the incompatibility of the adjacent single family homes with this industrial zoning. The City Council approved and issued a Specific Use Permit (SUP) for the known nuisance wood processing facility despite knowing of the incompatibility of the use with the adjoining single-family homes.

112. The City accepted deed restrictions for the 9527 site that the City then ignored when the City issued a Certificate of Occupancy for Blue Star Recycling in September 2018. Blue Star relied on the City's zoning and on the prior SUP for the CO.

113. The history of zoning for Ms. Jackson's home and the adjoining property show the City Council's failure to protect the single-family homes from adjoining industrial uses. In 1984, the City Council adopted planning policies that called for a new zoning code for the entire City. One purpose for the rezoning included the stabilization of the City's neighborhoods and the

improvement of the quality of life in Dallas. The 1984 planning policies required the protection

of residential neighborhoods from intrusive and destabilizing effects of industrial and other non-

residential uses. The new zoning code and the program for the transition to the new zoning code

was adopted on July 22, 1987. With the new rezoning, the City Council zoned the 9527 and 9505

properties immediately adjacent to Ms. Jackson's home and neighborhood as industrial, IR,

despite the City requirement for protecting residential neighborhoods from industrial uses. The

City Council failed to follow its policies and protect her single-family home and her

neighborhood from adjoining industrial zoning.

114. The City Council's rezoning in 1987 did not protect the City's Black and Hispanic

residential neighborhoods from industrial zoning adjacency. The City's subsequent land use

plans and zoning have not protected the City's Black and Hispanic residential neighborhoods

from industrial zoning and industrial uses. The City's subsequent land use plans and zoning have

not protected Ms. Jackson from adjoining industrial zoning and industrial uses.

115. There is further evidence of City actions allowing industrial uses adjacent to single

family homes in Black neighborhoods. In the mid 2000s, the City was required by Court order to

remediate the state's largest illegal landfill that was located in a predominantly Black

neighborhood because of the City's contributions to the creation of that illegal landfill including

by issuing permits for site. This site is now the Trinity River Audubon Center location.

**3. The sequence of events leading up to the decision, as compared to other decisions on comparable matters show the City's actions harm Black and Hispanic residential neighborhoods.**

116. The sequence of events leading up to the City Council's decision to re-zone the 9527

S. Central property in 2007 to the heaviest industrial use is contrary to the City's usual process

for determining if the heavy industrial use is incompatible with adjoining single-family homes.

35

As set out at paragraphs 89-90, the City Council knew of the adjoining single-family homes, including Ms. Jackson's home, and increased the zoning to the heaviest industrial category anyway.

117. The sequence of events leading up to the City's decision to the issuance of the Certificate of Occupancy in September 2018 to Blue Star Recycling included violating the known deed restrictions on the 9527 site. The City issued the CO in clear violation of the deed restrictions. The deed restrictions limit the use to wood processing (which is not shingle recycling) and only by issuance of a Specific Use Permit by the City Council. The City did not require a SUP for the Blue Star operation at this location. The City is required to follow deed restrictions for issuing COs. The City did not perform any Residential Adjacency Review prior to issuing the use as was required by the deed restrictions.

118. Other City decisions to issue permits to operate shingle recycling facilities show that the City is required to follow its process as set out in its code. The City followed this process for a location next to the entrance to McCommas Bluff landfill but did not follow this process for the 9527 property next to Ms. Jackson's home.

### 4. The City departed from normal City procedures and substantive legal requirements with regards to the Shingle Mountain property.

119. The City followed none of the required City processes for issuing a Certificate of Occupancy for the 9527 site. The City failed to follow the existing deed restrictions on the property which limit the use to only that of a wood processing facility and only with the issuance of a SUP by the City. The deed restrictions prohibit a shingle recycling facility or a solid waste landfill on the site.

120. The usual City process for obtaining a Specific Use Permit (SUP) for a shingle recycling facility is demonstrated by SUP 1395, which was for a facility located next to the entrance to McCommas Bluff landfill. As set out at paragraphs 68-69, the process requires the City's assessment of a site plan, visual screening, and height limitations. The City did not follow this process for the Shingle Mountain property.

121. The City Council increased the zoning for the 9527 property to the heaviest industrial use contrary to City policies to protect residential neighborhoods from industrial uses. The City Council provides zoning protection to predominantly White non-Hispanic residential neighborhoods that prevents these neighborhoods from adjacency to industrial IR and IM zoning. The only residential neighborhoods in the City with adjacency to IR and IM zoning are Black and Hispanic neighborhoods.

**5. The legislative and administrative history of the City actions at the site show that the City is not removing the illegal Shingle Mountain landfill that it helped create.**

122. The City's legislative and administrative actions of issuing the permit for the site and in increasing the industrial zoning are set out above at paragraphs 67-76.

123. The City Council refused requests from Ms. Jackson for the City to remove the illegal landfill.

124. The City Council refused the request of the Dallas City Manager to provide funds to remove Shingle Mountain. In September 2019, the City Council specifically rejected amendments to the City budget to provide for the City payment of removal of the Shingle Mountain illegal landfill.

125. The City has had the authority to enter onto the Shingle Mountain property and remove the solid waste materials placed in the floodplain. The City refuses to exercise this

authority. Instead, the City continues to subject Ms. Jackson to daily harm and injury from the adjacency to the illegal Shingle Mountain landfill. The City states it is minimizing the impact on taxpayer money with its decision to not remove the waste itself. This decision was made knowing that Ms. Jackson and her neighbors continue to reside next to the illegal landfill.

126. While the City refuses to remove the illegal solid waste from the 9527 S. Central property, the City Council has spent significant sums of taxpayer money to remediate environmental harms in order to benefit White non-Hispanic neighborhoods. As set out above, one example is where the City Council spent $2.5 million of City funds to remove a concrete plant from Trinity Groves in 2015.

**6. The consistent pattern of actions of City decision-makers have imposed much greater harm on people of color than on Whites.**

127. The City Council has acted quickly to remove environmental industrial harms in order to benefit White non-Hispanic persons. As set out above, the City Council spent City funds to relocate the Argos concrete plant away from Trinity Groves for the redevelopment of and further gentrifation of this location. Prior to the existence of Trinity Groves, when this location was predominantly Hispanic and Black, the City did not relocate this nuisance industry. Once the Trinity Groves developers requested the "eyesore" be removed from the gentrified shopping location, the City Council acted to fund the relocation and rebuilding of the Argos concrete plant away from Trinity Groves and into a predominantly Black and Hispanic neighborhood.

128. The City Council's zoning pattern reveals the City protecting predominantly White non-Hispanic residential neighborhoods from industrial zoning and industrial uses. The only locations in the City where industrial zoning (IM or IR) is adjacent to single-family homes is in Black and Hispanic neighborhoods with one limited exception. The corresponding permitting of

industrial uses located adjacent to homes by the City is only for locations in predominantly Black and Hispanic neighborhoods.

## IV.    Claims for Relief

129. Defendants CCR Equity One Holdings, LLC, the owner of an illegal landfill, and Cabe Chadick, its governing and managing member, have contributed and are contributing to the past and present handling, storage, treatment, or disposal of solid or hazardous waste that caused the creation of the Shingle Mountain illegal landfill which presents an imminent and substantial endangerment to health and the environment in violation of 42 U.S.C. § 6972(a)(1)(B).

130. Defendant Blue Star Recycling LLC, the operator of an illegal landfill, has contributed and is contributing to the past and present handling, storage, treatment, or disposal of solid or hazardous waste that caused the creation of the Shingle Mountain illegal landfill which presents an imminent and substantial endangerment to health and the environment in violation of 42 U.S.C. § 6972(a)(1)(B).

131. Defendant City of Dallas contributed and is contributing to the past and present handling, storage, treatment, or disposal of solid or hazardous waste that caused the creation of the Shingle Mountain illegal landfill which presents an imminent and substantial endangerment to health and the environment in violation of 42 U.S.C. § 6972(a)(1)(B).

132. Defendant City of Dallas actions have placed industrial zoning adjacent to Plaintiff's residence in a Black and Hispanic neighborhood. The City does not place industrial zoning adjacent to predominantly White non-Hispanic residential neighborhoods with only one limited exception. The City of Dallas acts to authorize and pay City funds to remediate environmental harms in White non-Hispanic neighborhoods but refuses to remediate the Shingle Mountain illegal solid waste landfill next to Plaintiff's home. These official City actions discriminate

against Plaintiff on the basis of race or color in violation of the Equal Protection clause of the

Fourteenth Amendment to the U.S. Constitution. These actions have been taken pursuant to

official municipal policy of the City of Dallas and have caused injury to Plaintiff in violation of

42 U.S.C.§ 1983.

V.    **Prayer for Relief**

Plaintiff seeks an injunction for future relief that:

1) orders Defendants to remove all solid and any hazardous waste at Shingle Mountain

and to perform the remediation of the property to eliminate all endangerments to health and the

environment at the sites,

2) prevents the use of the two Shingle Mountain properties at 9505 and 9527 S. Central

Expressway for any future landfill site or shingles recycling use or any industrial use,

3) requires Defendants to take such other action as may be necessary to comply with 42

U.S.C. 6972(a),

4) orders Defendant City of Dallas to re-zone the Shingle Mountain properties 9505 and

9527 S. Central Expressway for uses compatible with single-family homes under the City zoning

code,

5) provides any other relief that may be necessary, and

6) orders Defendants to pay attorney's fees, litigation costs and expenses.

Respectfully Submitted,


/s/ Laura B. Beshara
Laura B. Beshara
State Bar No. 02261750
DANIEL & BESHARA, P.C.
3301 Elm Street
Dallas, Texas 75226-1637
214-939-9230
Fax 214-741-3596
E-mail: laurabeshara@swbell.net
Attorney for Plaintiff

Michael M. Daniel
State Bar No. 05360500
DANIEL & BESHARA, P.C.
3301 Elm Street
Dallas, Texas 75226-1637
214-939-9230
Fax 214-741-3596
E-mail: daniel.michael@att.net
Attorney for Plaintiff


Certificate of Service

I hereby certify that July 8, 2020, I electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case files system of the court. The electronic case files system will send a "Notice of Electronic Filing" to the following individuals who have consented in writing to accept this Notice as service of this document by electronic means.

s/ Laura B. Beshara

# PHOTOGRAPHIC DOCUMENTATION

| Investigation Number: | 1326670 | Site Name: | Blue Star Recycling |
|---|---|---|---|
| Photographs Taken By: | Clint Burnett | Date: | 11/09/2018 |



**Photograph No. 1**

**Location:** Photo taken facing west at the entrance of the facility.

**Description:** Photo shows where the trailers and trucks of shingles are initially accepted, and the incidental material is removed.



**Photograph No. 2**

**Location:** Located in the center of the site, photo taken facing north.

**Description:** Photo shows the main pile of whole shingles being loaded into the initial grinder for processing.

Exhibit 1

# PHOTOGRAPHIC DOCUMENTATION

| Investigation Number: | JS26670 | Site Name: | Blue Star Recycling |
|---|---|---|---|
| Photographs Taken By: | Clint Burnett | Date: | 11/09/2018 |



**Photograph No. 3**

**Location:** Located on the west side of the site, photo taken facing south.

**Description:** Photograph of the on-site recycled shingle operations. Note the whole shingles pile in the background and the multiple, smaller piles of processed shingles near the rotary drum screener.

2018/11/09



**Photograph No. 4**

**Location:** Photo taken facing south.

**Description:** The facility operators piled the wooden pallets along the eastern fence line of the site to be taken to GWG Wood Group for wood recycling.

2018/11/09

Exhibit 1